## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

HENRY WILLIAMS                                                    PLAINTIFF
ADC #094006

v.                          No: 4:22-cv-00826-KGB-PSH

DEXTER PAYNE, *et al.*                                            DEFENDANTS

## PROPOSED FINDINGS AND RECOMMENDATION

## INSTRUCTIONS

The following Recommendation has been sent to Chief United States District Judge Kristine G. Baker.  You may file written objections to all or part of this Recommendation.  If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation.  By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

### I.  Introduction

Plaintiff Henry Williams filed this *pro se* 42 U.S.C. § 1983 action while confined in the Arkansas Division of Correction.  Williams alleges that certain ADC officers and employees failed to protect him from at attack that occurred on March 11, 2022, and that he failed to receive appropriate medical care afterwards.  Doc. No. 3.  After

screening Williams' complaint, the Court issued service on defendants Director Dexter Payne, Deputy Warden Robert Pierce, Warden Gary Musselwhite, Officer Natalie Bass, Officer Dennis Goins, Officer Laura Cook, Nurse Practitioner Lerizza Nunag, and Nurse Assistant Joseph Wesson-Points with respect to certain claims. *See* Doc. Nos. 15 & 42. Numerous claims have since been dismissed,[1] and the following claims remain: (1) Eighth Amendment failure to protect claims against Pierce, Goins, and Bass in their individual capacities (the "ADC Defendants"); and (2) Eighth Amendment deliberate indifference claims against Nurse Practitioner Lerizza Nunag and Nurse Assistant Joseph Wesson-Points (the "Medical Defendants"). *See* Doc. Nos. 94 & 119.

Before the Court are motions for summary judgment and related pleadings filed by the Medical Defendants, the ADC Defendants, and Williams (Doc. Nos. 145-147, 177-179, 180-182 & 201-212).[2] For the reasons described below, Williams' motion should be DENIED, and the motions filed by the ADC Defendants and the Medical Defendants should be GRANTED.

---

[1] The following claims were dismissed for failure to state a viable claim: Williams' claims against Wellpath; his understaffing claims; his claims against the ADC Defendants in their official capacities; his retaliation claims against Musselwhite, Pierce, and Cook; and his corrective inaction claims against Payne and Musselwhite. *See* Doc. No. 94 (adopting Doc. No. 67). Williams' retaliation claim against Nunag and his failure to protect claims against Musselwhite and Cook were dismissed for failure to exhaust administrative remedies. *See* Doc. No. 119 (adopting Doc. No. 112).

[2] This case was stayed from January 16, 2025, through May 14, 2025, due to the bankruptcy of the Medical Defendants' employer, Wellpath LLC. *See* Doc. Nos. 187 & 196; *In re Wellpath Holdings, Inc., et al.*, Case No. 24-90533 (Bankr. S.D. Tex).

## II. Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 321 (1986). When ruling on a motion for summary judgment, the court must view the evidence in a light most favorable to the nonmoving party.[3] *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). The nonmoving party may not rely on allegations or denials, but instead must demonstrate the existence of specific facts that create a genuine issue for trial. *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007). The nonmoving party's allegations must be supported by sufficient probative evidence that would permit a finding in his favor on more than mere speculation, conjecture, or fantasy. *Id.* (citations omitted).

An assertion that a fact cannot be disputed or is genuinely disputed must be supported by materials in the record such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . .

---

[3] In *Reed v. City of St. Charles, Mo.*, 561 F.3d 788 (8th Cir. 2009), the Eighth Circuit Court of Appeals discussed the requirement that facts be viewed in the light most favorable to the nonmoving party when considering a motion for summary judgment. The Court stated, "[i]f 'opposing parties tell two different stories,' the court must review the record, determine which facts are material and genuinely disputed, and then view those facts in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them." *Id.* at 790 (*quoting Scott v. Harris*, 550 U.S. 372, 380 (2007)).

.". FED. R. CIV. P. 56(c)(1)(A). A party may also show that a fact is disputed or

undisputed by "showing that the materials cited do not establish the absence or presence

of a genuine dispute, or that an adverse party cannot produce admissible evidence to

support the fact." Fed. R. Civ. P. 56(c)(1)(B). A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a fact is

material if its resolution affects the outcome of the case. *Othman v. City of Country

Club Hills*, 671 F.3d 672, 675 (8th Cir. 2012). Disputes that are not genuine or that are

about facts that are not material will not preclude summary judgment. *Sitzes v. City of

West Memphis, Ark.*, 606 F.3d 461, 465 (8th Cir. 2010).

### III.  Williams' Relevant Complaint Allegations[4]

Williams alleges that he appeared before a classification committee that included

ADC Defendant Pierce on March 1, 2022. Doc. No. 3 at 4, ¶ 14. He claims he asked

the committee members to place him in protective housing because gang members in

general population were threatening to kill him. *Id.* He alleges they did not investigate

his allegations and returned him to housing unit 10-B in general population where the

death threats originated. *Id.* at 4-5, ¶¶ 14-15. Williams further alleges that he was

attacked on the night of March 11, 2022, after he informed ADC Defendants Goins and

Bass that inmates were threatening to kill him. *Id.* at 5-6, ¶¶ 16-23. He also complains

---

[4] A full description of Williams' complaint is included in the Court's Proposed
Findings and Partial Recommendation entered on March 17, 2023 (Doc. No. 67). The
complaint allegations described in this recommendation pertain to Williams' *remaining*
claims in this case. *See* footnote 1, *supra.*

that while he was being attacked, Goins and Bass were standing in the hallway talking. *Id.* at 16, ¶ 23 (Exhibit B, Grievance CU-22-00248).  Finally, Williams alleges that Goins intentionally left his assigned housing unit, thereby enabling the attack, and that Bass encouraged Goins to do so.  *Id.* at 10, ¶ 37.

Williams also asserts Eighth Amendment deliberate indifference claims against Medical Defendants Nunag and Wesson-Points, claiming they were deliberately indifferent to his serious medical needs following the March 11 attack.  Doc. No. 15. Specifically, he alleges that Wesson-Points, who treated him following the attack:

> . . . fail[ed] to properly access and medically treat Petitioner Williams for his head truma injury.  Petitioner Williams was only given peroxide, mesh gauls to stop the head bleeding.  The nurse assistance refuse to stitch Petitioner Williams Head wound stated he didn't know how to preform the procedure.  No medical doctor or nurse practiner was on duty the night of the attack.

Doc. No. 3 at 6-7, ¶ 24.[5]  As to Nunag, Williams states:

> On March 14, 2022, Petitioner Williams place a sick call request to be seen by a doctor to properly examine stitch his head wound an to conduct an X-ray, MRI to properly medical access Petitioner Williams head injury due to Williams having sever head pain, headaches, blurred vision, sever dizziness, periodic nose bleed's and flesh still hanging from the head wound, of Petitioner Williams.
>
> . . . Petitioner was seen by Practioner Nunage in which Defendant Nunage refuse to look at or examine Petitioner Williams head injury & refuse to order an X-ray or MRI to access the skull fracture or soft tissue brain damage Petitioner Williams substain during the attack.  . . .

---

[5] Documents are transcribed verbatim without any corrections for misspellings or mistakes.

Doc. No. 3 at 6-7, ¶¶ 25-26.  Williams claims that the Medical Defendants' refusal to treat his head injury led to more medical and mental health problems and caused him pain, suffering, physical injury and emotional distress.  *Id.* at ¶¶ 44-47.

## IV.  Facts[6]

### *The March 11, 2022 Attack*[7]

Williams had an altercation with several inmates, including inmate Sharp, in 12A barracks at the Cummins Unit in February of 2022.  Doc. No. 177-2, *Transcript of Henry Williams' Deposition Testimony* ("*Williams Deposition*"), at 25:17-25 – 26:2-25.  After the altercation, Williams received a disciplinary and was sentenced to 30 days punitive isolation.  *Id.* at 25:20-21; 32:9-21.  Williams testified that he went before the classification committee on March 1, 2022, and told the members, including defendant Pierce, that he felt unsafe in the area where the February altercation occurred.  *Id.* at 29:10-17, 32:22-25.  Specifically, he said:

> Well, we talked about the incident and about restrictive housing, what had happened, and I informed them, you know what I'm saying, in that area I didn't feel safe in that area.  So they said we're going to make a decision and make a vote dealing with putting me in restrictive housing, and that was it.

---

[6] Unless otherwise noted, these material facts are taken from the parties' statements of undisputed facts, responses, and the other exhibits provided.  Disputed facts are noted.  Opinions, argument, legal conclusions, and immaterial facts are omitted.

[7] Facts concerning Williams' subsequent requests for protective housing and disciplinaries he may have received for refusing to return to general population after the March 11 attack are omitted because they are not relevant to the Williams' remaining claims against ADC Defendants Pierce, Goins, and Bass for failing to protect him from the March 11, 2022 attack.  *See* Doc. No. 119 at 5 (stating that certain grievances do not exhaust his claims because they "do not relate back to any claim that Mr. Williams has that ADC officials failed to protect him from the March 2022 attack.").

*Id.* at 29:12-17.  The committee voted initially on March 1, 2022, and again on March 7, 2022, after a "review," to release Williams to general population after his punitive sentence ended.[8]  Doc. No. 177-10, *Classification Committee* Action, at 3-4.  Williams testified he believed they did so because they determined he faced no threat.  *Williams Deposition* at 30:11-24, 33:1-8.  He was placed in Barracks 10B, not 12A, where his altercation with Sharp took place.

Defendant and classification committee member Pierce does not specifically address what Williams told the committee members during the March 1 classification committee meeting in his declaration filed in support of his motion for summary judgment.  *See* Doc. No. 177-5, *Declaration of Robert Pierce*, at ¶¶ 22-23.  He states that he was unaware that Williams had requested to be placed in protective custody and that Williams did not request that he be separated from any inmates in Barracks 10B prior to the March 11 attack.  *Id.* at ¶¶ 13, 22.  Pierce further states that there was no prior history of any conflict between Williams and any inmates in Barracks 10B on March 11, 2022.  *Id.* at ¶ 23.  He states that the only person on Williams' enemy alert list at that time was inmate Sharp, who was not housed in Barracks 10B.  *Id.* at ¶¶ 13, 21.

---

[8] Documents relating to the meeting and review state:  "Inmate will not be assigned and is to be released, after Punitive, to population upon available bed space." Doc. No. 177-10 at 1-6.

On March 11, 2022, non-defendant Lieutenant Haney escorted Williams to Barracks 10B, which is next to Barracks 12A where he had a prior altercation with Sharp in February. *Williams Deposition* at 33:13-17, 35:9-11, 28:23-25. Williams testified that he told Haney he felt unsafe there, and that he also told the guard at the door[9] what was going on, but the guard said nothing and just moved him into the barracks. *Id.* at 24:15-19, 19:19-23. He testified there were people in the back of the barracks that

> . . . started sending little threats, what they're going to do and we're going to kill you and all that, you know what I'm saying, and different, you know what I'm saying, different threats like that, death threats and stuff like that.

*Id.* at 39:6-11. Williams did not know who any of these individuals were, but he "guessed" they were affiliated with inmate Sharp, who was next door and could communicate with these inmates through a big window between the barracks. *Id.* at 39:13-25, 42:20-25 - 41:1-5. *See also id.* at 51:24-25 – 25:1-3; 58:16-25. He also testified that Sharp had seen him when he walked by Barracks 12A to get to Barracks 10B, and again when Sharp came out for chow. *Id.* at 59:2-9. Williams testified that when Sharp came out for chow,

> he pulled up to the window and, like I said, that officer there that was on that door had to have him removed, you know, remove him from the door. He was making signs like a gun, like shooting an individual, you know what I'm saying. That was, like, inciting the other guys, whoever he was

---

[9] Williams testified that he sought the security logs to learn the name of this officer but did not receive them during discovery. *See e.g., Williams Deposition* at 35:18-25 -- 36:1-7. The Court previously addressed Williams' request for officer logs, ordering that he be provided the names of the officers assigned to unit 10-B on that date. *See* Doc. No. 172. Williams did not subsequently file another motion relating to these names.

connected with in the back of the barracks, you know what I'm saying.
You know, they were – oh, we got it, we're going to kill him, we got it,
we're going to get his ass out of here, you know what I'm saying, all them
different types of threats and stuff like that there.

*Id.* at 59:9-19.

Williams further testified: "Once Goins came on, he came on around about 6:00,
I informed him what was going on" and "that the environment was not safe." *Id.* at
19:23-25 – 20:6-8, 40:5-10, 41:1-4. He said, "I told him that a lot of inmates in the
back were sending death threats to kill me and I needed to be removed from the barracks
immediately." *Id.* at 43:9-14.

Williams testified that after he told Goins he felt unsafe, Goins began to talk with
Bass and they walked down the hall towards Barracks 11. *Id.* at 20:9-15, 64:18-24. He
also said he tried to talk to them and let them know that he felt unsafe and had been
threatened before they walked off. *Id.* at 44:15-18. Williams also claimed that inmates
were talking to Goins and Bass, and he believed they told Goins and Bass they planned
to attack Williams. *Id.* at 44:19-24, 46:6-10.[10]

Williams stated that the power went out at some point, and he fell asleep while
waiting on Goins to return to the security booth. *Id.* at 20:16-19. When he woke up,

---

[10] Williams testified that he sought video footage to show the identity of the
individuals who spoke to Goins before the attack. *Williams Deposition*, at 62:1-23. He
claimed video footage from that day would also show Sharp making threatening gestures
when he was released for chow. *Id.* at 62:24-25 – 63:1-7. The Court previously
addressed Williams' request for this video footage, ordering that he be allowed to watch
it if it existed. *See* Doc. No. 172. Williams did not subsequently file another motion
relating to the video footage.

four individuals were attacking him with a lock, and he then passed out. *Id.* at 47:2-7. He testified he did not know any of these individuals. *Id.* at 58:10-14. Williams testified that he woke up in a pool of blood, went to the door, did not see Goins or anyone in the security booth, and began to beat on the door. *Id.* at 47:8-15; 55:22-25 – 56:1-7. He said that Goins, Bass, and another officer came down the hall, and Bass called a code. *Id.* at 47:16-18. Williams said he was then escorted to the infirmary. *Id.* at 47:20. He guessed this happened around 6:45 p.m., but he could not be sure because he was dizzy and in a "daze." *Id.* at 47:21-24, 52:4-8.

According to his declaration, Goins arrived at the Cummins Unit to begin his shift at 6:00 p.m. on March 11, 2022. Doc. No. 177-3, *Declaration of Dennis Goins*, at ¶ 4. He explained that he was assigned to work 9 and 10 Barracks that evening, and that each barracks has two sides, an A side and a B side. *Id.* at ¶¶ 5-6. Goins therefore had four areas to monitor: 9A, 9B, 10A, and 10B. *Id.* at ¶ 7. He explained that his job was to count the inmates in each barracks when he first arrived and every 35-40 minutes thereafter. *Id.* at ¶ 8. Goins recalled a power outage occurred sometime after 6:00 p.m. on March 11, 2022, and that around 6:50 p.m., he noticed Williams beating on the door in 10B Barracks. *Id.* at ¶¶ 9 & 11. He stated that he called for supervisor assistance,[11] and Bass arrived with additional staff, and they restrained Williams and escorted him to the infirmary. *Id.* at ¶¶ 12-14. In his declaration, Goins stated that he was unaware

---

[11] Williams disputes that Goins called "code 4," and insists it was Bass who did. Doc. No. 206 at 11-12. This is not a material fact in this case.

of any threats made to Williams or any other inmate. *Id.* at ¶ 15. In an incident report,

Goins stated:

> On March 11, 2022 At Approx. 6:50 p.m. I Cpl. Dennis Goins was
> working East 2 (zone 1) when I noticed Inmate Henry Williams #94006
> (10B, Rack 4, IV, Hoe Squad) bleeding from the head. I then called a
> code 4 (Incidents needed supervisor attention). Sgt. N. Bass along with
> additional staff arrived, placed Inmate Williams in hand restraints and
> escorted him to the infirmary for treatment.

Doc. No. 177-6, *Incident Report*, at 2.

Bass (now Lieutenant Bass-Magee) provided a declaration stating that she was

on duty as a sergeant on March 11, 2022. Doc. No. 177-4, *Declaration of Natalie Bass-*

*Magee*, at ¶¶ 6-7. She stated that she responded to a call from Goins at 6:50 p.m., and

was informed that Williams was bleeding from his head in Barracks 10B. *Id.* at ¶¶ 7-

8. Bass, along with other staff, restrained Williams and took him to the infirmary. *Id.*

at ¶ 9. In her declaration, Bass stated that she was unaware of any threats made to

Williams or any danger to his safety before he was attacked. *Id.* at ¶ 15. In an incident

report, Bass stated:

> On March 11, 2022 at Approx. 6:50 p.m. I Sgt. Natalie Bass responded
> to Cpl. Dennis Goins needing a Supervisor at East 2 (zone 1). Upon
> arrival Cpl. Goins advised that Inmate Henry Williams #94006 (10B,
> Rack 4, IV, Hoe Squad) bleeding from his head. Myself along with
> additional staff arrived, placed inmate Williams in hand restraints and
> escorted him to the infirmary where he was treated for his injuries. While
> in the infirmary inmate Williams refused to give any information
> concerning how he sustained his injuries. An investigation was started.
> Staff went to 10B barrack, placed on all inmates on their assigned racks
> and looked for any signs of them being in a physical altercation. Several
> inmates assigned to 10B was questioned but no one had knowledge about
> the incident or would write a witness statement. It could not be

determined who assaulted Inmate Williams due to camera footage not being functional due to a partial power outage in the barrack caused by inclement weather. His property was searched and packed with no contraband being found. Inmate Williams was given a direct order to submit to an onsite urinalysis in which he refused to provide a sample. Major Disciplinary was written. Maintenance was notified of the power outage as well as Deputy Warden Young.

*Incident Report* at 4.

### *Williams' Medical Treatment*

Williams was admitted to the infirmary at the Cummins Unit on March 11 after the attack and seen by Medical Defendant Joseph Wesson-Points. Doc. No. 147-1 at 1 (medical record contains one note by Wesson-Points, stating "Pt walked in for altercation with other prisoner"). The next morning at 5:08 a.m., non-defendant Asia Wilson performed a wellness check in the infirmary. Doc. No. 147-3 at 1. She noted:

inmate was involved in an altercation on the night of 03/1/22. patient states, "I was hit with a lock."

Inmate is A&Ox3. resp even and unlabored. patient is supine in bed. verbally responds and answers questions. clear speech.

patient attempted to sit up in bed but immediately laid back down in bed, patient states, "I am very dizzy."

vital signs were taken. patient is unable to stand to feet at this time. gait and balance is undermined at this time. patient is noted holding his head and c/o headache. patient rates headache pain as a 10. patient denies having nausea/vomiting.

laceration to back of head. bleeding is controlled.

hand grips are equal bilaterally. patient is able to wiggle and move fingers to both hands. sensation and feeling equal bilaterally. patient is able to lift arms and lift legs. flex and extend, point toes on right foot. patient states he has a previously injury and has pins and rods in left foot and states he is unable to point and flex left foot.

patient has only had sips of water during this shift. refused breakfast chow tray.

*Id.* At 8:05 a.m., non-defendant Tarsha Goodman noted:

> LOC fully conscious. PERRLA. Symmetrical facial grimace. AAOx2. Dizziness with ambulation to door for vital signs. Small laceration to posterior skull. Cleaned with dermal would cleanser and hydrogen peroxide. Steri strips applied.

*Id.* at 2. At 12:25 p.m., Goodman noted that Williams complained of a headache with a pain level of 10 and dizziness with standing. *Id.* She further noted "AAOx3 LOC fully conscious. PERRLA. Symmetrical facial grimace. Equal hand grips." *Id.* Goodman informed Williams that he was scheduled to receive acetaminophen (APAP) every 12 hours to begin soon. *Id.* At 7:48 p.m., non-defendant Shirley Lubin noted that Williams voiced no complaints of pain or discomfort. *Id.* at 3. She also noted that he had received 1000 mg of acetaminophen (Tylenol) at 6:00 p.m. and had tolerated it well, and also noted his vitals. *Id.*

On March 13, 2022, Williams reported decreased pain and said he was "ready to go." Doc. No. 147-4 at 1. Lubin noted "no neck rigidity. Grips good bilat. Amb. w/o diff. show steady gain." *Id.* She administered Tylenol, and Williams was discharged from the infirmary. *Id.*

On March 18, 2022, Williams was seen by non-defendant Michelle Musselwhite at sick call. Doc. No. 147-5 at 1. She noted his complaint that he was "still suffering from dizziness headaches unbalance when I walk and blurred vision from being hit in the back of the head with a lock. the screws and rod in my left ankle is still giving me pain and swelling. I have nothing for pain that's working during the day." *Id.* Williams

reported nausea but not vomiting. *Id.* Musselwhite prescribed acetaminophen and referred him to the provider. *Id.*

On March 25, 2022, Mr. Williams was seen by Medical Defendant APRN Lerizza Nunag at sick call.[12] Doc. No. 147-7 at 1. He complained of continued dizziness; he denied headaches, vomiting and blurred vision. *Id.* Nunag noted that Williams was alert and oriented x 3 with purposed movements and no evidence of incoordination. *Id.* Under notes, she listed "concussion." *Id.* Nunag ordered an X-ray of his foot and lab tests, as well as acetaminophen 325mg for 7 days. *Id.*

On April 28, 2022, Williams requested medication for his foot pain. Doc. No. 147-9. Collene Rogers reviewed his foot X-ray which revealed osteopenic bones. *Id.*; Doc. No. 147-10 (X-ray results). Rogers prescribed acetaminophen for 30 days and exercises. Doc. No. 147-9.

Nunag treated Williams or prescribed medications for his headaches and/or blurred vision again on May 20, June 21, July 5, and August 28, 2022. *See* Doc. Nos.

---

[12] This is the first record of Williams being seen by Medical Defendant Nunag. He previously submitted a grievance dated March 14, 2022, stating he had seen Nunag that day. There is no March 14, 2022 visit with Nunag reflected in the records submitted with the Medical Defendants' motion for summary judgment. This unnumbered grievance is the only basis for the Court's prior finding that Williams may have exhausted administrative remedies with respect to Nunag and Wesson-Points. *See* Doc. No. 112 (citing Doc. No. 103 at 24). There was no evidence he completed any other grievances before filing this lawsuit. *See id.* Accordingly, his only Eighth Amendment claims against Nunag and Wesson-Points stem from their initial treatment of his head injury following the March 11 attack; any claim relating to ongoing treatment for his head injury or pre-existing foot condition was not exhausted. *See id.* at 12-13 (describing grievance CU-22-00681 submitted on August 8, 2022, and concluding that it did not serve to exhaust any of his claims).

147-11, 147-13 – 147-15 &  147-18 – 147-19.  She also ordered an optometry consult

and lab tests on June 21, 2022, and Williams was prescribed eyeglasses on August 11,

2022.  Doc. Nos. 147-13 & 147-17.

### *Dr. Mahlon Maris Affidavit*

In support of their motion for summary judgment, the Medical Defendants

submitted the affidavit of Dr. Mahlon Maris, a family practice physician.  Doc. No.

147-2 at ¶ 2.  Dr. Maris reviewed Williams' medical records from March 2022 through

September 2022 to determine if the care and treatment Williams received was

appropriate, particularly with respect to his complaints of headaches, dizziness, and foot

pain following an altercation on March 11, 2022.  *Id.* at ¶ 3.  According to Dr. Maris,

the care and treatment Williams received for these complaints was appropriate,

adequate, and timely.  *Id.* at ¶¶ 5-10.

Williams objects to the admissibility of Dr. Maris' affidavit and claims it is false,

but provides no legal basis for his objection.  *See* Doc. No. 201 at 3; Doc. No. 202 at 3-

6 & 9; Doc. No. 203 at 2-3, 31-39.

### V.  Discussion

#### A.    *The ADC Defendants*

The ADC Defendants assert that they are entitled to qualified immunity with

respect to Williams' failure to protect claims. Qualified immunity protects government

officials from liability for damages "insofar as their conduct does not violate clearly

established statutory or constitutional rights of which a reasonable person [in their

positions] would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Qualified immunity is a question of law and is appropriately resolved on summary judgment. *McClendon v. Story County Sheriff's Office*, 403 F.3d 510, 515 (8th Cir. 2005); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  To determine whether a defendant is entitled to qualified immunity, the Court must consider two questions: (1) do the facts alleged by plaintiff establish a violation of a constitutional or statutory right; and (2) if so, was that right clearly established at the time of the defendant's alleged misconduct. *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015).  Courts may exercise "their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  In this case, the Court finds that Williams fails to establish a constitutional violation, as explained below.

An inmate has a constitutional right to be free from attacks by others. *See Robinson v. Cavanaugh*, 20 F.3d 892 (8th Cir. 1994).  To succeed on a failure to protect claim, Williams must show that there was a substantial risk of serious harm to him and that defendants were deliberately indifferent to that risk. *See Irving v. Dormire,* 519 F.3d 441, 447 (8th Cir. 2008).  Specifically,

> This claim has an objective component, whether there was a substantial risk of serious harm to the inmate, and a subjective component, whether the prison official was deliberately indifferent to that risk. *Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000).  To be liable, "the official must both be aware of facts from which the inference could be drawn that a

> substantial risk of serious harm exists, and he must also draw the
> inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128
> L.Ed.2d 811 (1994). . . .

*Vandevender v. Sass*, 970 F.3d 972, 975 (8th Cir. 2020).  The Eighth Circuit Court of

Appeals has recognized that prison officials are entitled to qualified immunity when an

inmate is attacked by surprise.  *See Schoelch v. Mitchell*, 625 F.3d 1041, 1047-49 (8th

Cir. 2010); *Tucker v. Evans*, 276 F.3d 999, 1001 (8th Cir. 2002); *Curry v. Crist*, 226

F.3d at 979; *Jackson v. Everett*, 140 F.3d at 1151; *Prosser v. Ross*, 70 F.3d 1005, 1007

(8th Cir. 1995); *Smith v. Marcantonio*, 910 F.2d 500, 502 (8th Cir. 1990).  Additionally,

an inmate's complaints regarding a "general fear for his safety" do not establish that a

defendant "acted with deliberate indifference by not placing him in protective custody."

*Robinson v. Cavanaugh,* 20 F.3d at 895; *see also Jones v. Wallace*, 641 Fed. Appx. 665

(unpublished) (a general fear of another inmate is not sufficient to put guards on notice

of a specific threat or danger).

Williams' failure to protect claim against ADC Defendant Pierce fails based on

his own testimony.  He testified that he told the committee on March 1 that he did not

feel safe in the area – he did not communicate any specific fear or threat he had received

that he would be attacked in general population.  And again, an inmate's general fear

for his safety is insufficient to establish a failure to protect claim. *See Robinson v.*

*Cavanaugh, supra.*  Accordingly, Pierce should be awarded summary judgment.

With respect to Williams' failure to protect claims against Goins and Bass, there

is a genuine dispute of material fact regarding the March 11 attack:  whether Williams

told Goins and Bass that he had been threatened by other inmates shortly after Goins came on duty at 6 p.m.  As stated above,[13] if opposing parties tell two different stories, as is the case here, the Court is required to view genuinely disputed material facts in a light most favorable to the nonmoving party, as long as those facts are not so blatantly contradicted by the record that no reasonable jury could believe them.

In this case, viewing the evidence in the light most favorable to Williams, he still cannot establish a failure to protect claim against Goins or Bass.  According to Williams' deposition, he told Goins he had been threatened by some inmates in the back of the barracks.  He did not provide more specific information, *e.g.*, he did not know who had threatened him and did not specifically describe who made those threats.  He simply indicated that he had received threats since being placed in the barracks earlier that day.  Further, while Williams testified that he tried to speak to Bass after he told Goins he felt threatened, it is not clear that he actually expressed his fears to Bass.  Rather, he speculates that Goins and Bass talked about his concerns and also speculates that other inmates told Goins and Bass they planned to attack him.  Setting aside his speculation, and even taking Williams' assertions as true, he failed to provide information to Goins and Bass that should have put them on notice of a specific and serious threat to him.  His general concern about unnamed or unidentified inmates being influenced by Sharp to attack him, without  more, was simply insufficient to establish

---

[13] *See* footnote 3, *supra.*

a substantial risk of serious harm.  The ADC Defendants are therefore entitled to qualified immunity on his failure to protect claims.  *See Robinson, supra*; *Blair v. Bowersox*, 929 F.3d 981, 988 (8th Cir. 2019) ("Even if [inmate plaintiff] had voiced his concerns to [defendant] about there being a hit out on him, there is no evidence [inmate plaintiff] knew who ordered it or who [his] enemies in general population may have been."); *Davis v. Scott*, 94 F.3d 444, 446-47 (8th Cir. 1996) (prison officials did not act with deliberate indifference where inmate asked to be placed in protective custody due to his fear that friends of his enemies who remained in general population would attack him where inmate could not provide names for his potential attackers and his "vague and unsubstantiated" statements did not constitute "sold evidence . . . of an identifiable serious risk to [his] safety.").

For these reasons, Williams' motion for summary judgment (Doc. No. 180) should therefore be DENIED,[14] and the ADC Defendants' motion for summary judgment (Doc. No. 177) should be GRANTED.

---

[14] The Court also notes that as plaintiff, Williams bears the burden of proof. However, his motion simply restates the allegations of his complaint and offers no dispositive evidence to prove his claims against the Defendants.  Rather, he refers to his own complaint, grievances, and deposition testimony; photographs of his head injury, the lock used to attack him, and his prison barracks; prison policies; the March 1, 2022 classification committee report; and the March 11, 2022 incident reports by Goins and Bass.  Doc. No. 180 at 1-4; Doc. No. 182.  While his deposition testimony that he informed Goins and Bass of a risk creates a material issue of fact, it is not dispositive for the reasons already explained.

### B.    *The Medical Defendants*

The Eighth Amendment's proscription of cruel and unusual punishment obligates prison officials to provide adequate medical care to inmates in their custody. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976).  To succeed with an inadequate medical care claim, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs.  *Coleman v. Rahija,* 114 F.3d 778, 784 (8th Cir. 1997). This requires a two-part showing that (1) the inmate suffered from an objectively serious medical need, and (2) the prison official knew of the need yet deliberately disregarded it.  *Id.; see also Farmer v. Brennan,* 511 U.S. at 837; *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).  Additionally, the Eighth Circuit has held that a "prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg by Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995).

Viewing the evidence in the light most favorable to Williams, the Court finds that the undisputed material facts do not establish that either Wesson-Points or Nunag was deliberately indifferent to Williams' serious medical needs.

Wesson-Points encountered Williams shortly after the March 11 attack.  While the records do not specify what treatment Wesson-Points provided to Williams that night, Doc. No. 147-1, Williams asserts in his complaint that Wesson-Points treated the cut on his head with hydrogen peroxide and gauze.  *See* Doc. No. 3 at 6, ¶ 24.  He complains that Wesson-Points did not stitch the cut, but when Williams was seen a few

hours later and examined by Nurse Asia Wilson, she did not provide stitches either.  In fact, she noted that that he had a laceration and the bleeding was controlled.  *See* Doc. No. 147-3 at 1.  Later that morning, another provider noted that Williams had a "small laceration" which she cleaned with dermal wound cleanser and hydrogen peroxide, and applied steri strips.  *Id.* at 2.  There is no indication Williams needed stitches, and he has come forward with no evidence to prove that any short delay in receiving steri strips worsened his injury or caused him any particular harm.

Williams has also come forward with no evidence to prove that Nunag failed to adequately treat his head injury after the March 11 attack.  He complains that he submitted a sick call on March 14, 2022, and that Nunag refused to order an X-ray or MRI.  *See* Doc. No. 3 at 7, ¶¶ 25-26.  His medical records show that he was seen by another provider on March 18, 2022, who noted his complaints, prescribed acetaminophen, and referred him to the provider.  Doc. No. 147-5.  He was then seen by Nunag on March 25, 2022.  Doc. No. 147-7.  She also noted his complaints, documented that he may have a concussion, ordered lab tests, and continued his prescription for acetaminophen.  *Id.*  Williams has come forward with no evidence to show that his complaints warranted the treatment he requested – an MRI or an X-ray – or that he has suffered any injury as a result of Nunag's failure to order any additional tests.  He also fails to show facts to suggest that Nunag's treatment decisions were made with deliberate indifference to his medical conditions.

Finally, the Court addresses Williams' claims regarding Nunag's ongoing treatment of a pre-existing foot injury.[15]  Williams' medical records show that Nunag did not ignore Williams' complaint about foot pain.  She treated Williams on March 2, 2022, and ordered an X-ray of his foot.  Doc. No. 147-7.  Another provider reviewed the X-ray's results with Williams.  Doc. Nos. 147-9 & 147-10.  Williams has come forward with no evidence to show that further treatment was warranted but not provided.  Nunag is therefore entitled to summary judgment with respect to Williams' claim that she was deliberately indifferent to his complaints of an ongoing foot injury in March of 2022.

The evidence provided in this case shows that Williams' claims regarding Wesson-Points and Nunag amount to a mere disagreement regarding treatment, which does not equate a constitutional violation.  *See Estate of Rosenberg by Rosenberg*, 56 F.3d at 37.  Furthermore, Dr. Maris reviewed Williams' medical records and concluded that Wesson-Points and Nunag appropriately treated Williams after the March 11 attack.  Williams has provided no evidence to refute Dr. Maris' opinion.  *See Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909 (8th Cir. 2010) (quoting *Flentje v. First*

---

[15] Williams arguably makes no such claim in his complaint.  *See* Doc. No. 3 at 7, ¶¶ 25-26.  Rather, he claims that Nunag did not adequately treat his head injury in retaliation for prior complaints he made about his foot.  *Id.* at ¶ 26.  That claim was dismissed based on Williams' failure to exhaust his administrative remedies.  *See* Doc. Nos. 119 & 112.  The only claim that Williams arguably exhausted was reflected in an unnumbered grievance dated March 14, 2022, in which he complained that Nunag refused to treat his head injuries or look at his foot.  Doc. No. 112 at 9 (quoting Doc. No. 103 at 24).

*Nat'l Bank of Wynne,* 340 Ark. 563, 11 S.W.3d 531 (2000) ("When the movant makes a prima facie showing of entitlement to a summary judgment, the respondent must discard the shielding cloak of formal allegations and meet proof with proof by showing a genuine issue as to a material fact."). Accordingly, there are no material facts in dispute, and the Medical Defendants' motion for summary judgment (Doc. No. 145) should be GRANTED.

## VI.  Conclusion

For the reasons stated herein, the undersigned recommends that Williams' motion for summary judgment (Doc. No. 180) be DENIED; the ADC Defendants' motion for summary judgment (Doc. No. 177) be GRANTED; and the Medical Defendants' motion for summary judgment (Doc. No. 145) be GRANTED. Williams' remaining claims should be DISMISSED WITH PREJUDICE.

DATED this 8th day of August, 2025.

_____
UNITED STATES MAGISTRATE JUDGE